### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **PHILIP T. SIEGEL, DDS,** | **CIVIL ACTION** |
|        **Plaintiff,** | |
| | |
| **v.** | |
| | |
| **MARK GOLDSTEIN, BRIAN SMITH,** | **NO.  19-2890** |
| **JOSEPH MULLIGAN, SAMER** | |
| **ABDELSAMIE AND DELAWARE** | |
| **VALLEY MAXILLOFACIAL AND ORAL** | |
| **SURGERY, P.C.,** | |
|        **Defendants.** | |

### <u>MEMORANDUM OPINION</u>

Plaintiff Philip T. Siegel is a retired dentist and former shareholder of Delaware Valley Maxillofacial and Oral Surgery, P.C. ("Delaware Valley P.C.") a dental practice.  He has brought suit against the practice and its shareholders with whom he entered into a Shareholders Agreement, Mark Goldstein, Brian Smith, Joseph Mulligan, and Samer Abdelsamie, premised on the cancellation of his shareholder interest in the practice.  The dispute has its genesis in Siegel's decision to retire and place his license into inactive status.  While his former colleagues remained unaware that he no longer held an active dentistry license he continued to receive a share of the profits from the practice.  But, when they learned of it, they cancelled his shares.

Upon Defendants' motion the matter was stayed pursuant to the Federal Arbitration Act, 9 U.S.C. § 3, while the parties arbitrated Plaintiff's legal claims pursuant to an arbitration clause in the Shareholders Agreement.  The arbitrator concluded that Defendants properly cancelled Siegel's shares, and that Siegel was properly and fully compensated for his interest in the practice through shareholder distributions he received while his license was inactive, but before his shares were cancelled.

Following the arbitration, Plaintiff amended his complaint to include additional claims.

Defendants filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), which is now before the Court.  For the reasons that follow, Defendants' motion will be granted.

## I.   FACTUAL BACKGROUND

The story as relevant here begins in 2005 when Plaintiff Siegel and three of the individual defendants – Goldstein, Smith, and Mulligan – executed an Operating Agreement under which each would be an equal owner of a dentistry practice, Delaware Valley Maxillofacial and Oral Surgery, LLC ("DVLLC").  Article XVI of the Operating Agreement provided that "without the consent of the affected Member this Operating Agreement may not be amended so as to alter the interest of the affected Member in any Distributions or Allocations of Profit or Loss or other economic rights of such Member, unless such change affects each Member's economic right in the same manner on a pro rata basis."

 In 2014, Siegel retired, and voluntarily placed his dental license in inactive status.  Although he no longer worked at the practice, he remained a member and continued to receive profit distributions and other benefits.  The arrangement appeared to be working well until April 2016 when DVLLC's accountant William Burns advised the practice's attorney Stuart Lundy that the entity should convert from an LLC to a professional corporation ("PC") for tax purposes.  Lundy passed on Burns' recommendation to Siegel, Goldstein, Smith, and Mulligan.  They were informed that the conversion from an LLC to a PC would "not affect any Member's continual right to their share (25%) of the monies distributed to all Members annually except now they will be shareholder distributions."

Although Siegel did not object to the conversion, neither did he participate in any discussions about how to effectuate it.  Lundy prepared an agreement for the shareholders to sign.  When Siegel reviewed it, he discovered that it did not include the protections of Article

XVI of the Operating Agreement.  Specifically, he became concerned that the proposed

agreement would allow the other shareholders to amend or modify the agreement in a way that

would disproportionately affect his percentage ownership in the PC.  Accordingly, he refused to

sign the proposed agreement unless it was amended to include the language of Article XVI or its

equivalent.

After some negotiation, the parties hammered out their differences and came to an

agreement.  The terms of the Shareholders Agreement for the new entity – Delaware Valley P.C.

– included in paragraph 24 the following language:

> This Agreement may be modified or amended from time to time by the
> Shareholders upon a Majority Vote of the Shareholders provided, however, that
> without the written consent of the affected Shareholder, this Agreement may not
> be amended so as to alter a Shareholders' Proportionate Share, unless such
> changes affects each Shareholders' Proportionate Share in the same proportionate
> manner.

With this language included, Siegel, Goldstein, Smith, and Mulligan signed the Shareholders

Agreement.  Abdelsamie became a shareholder in Delaware Valley P.C. shortly thereafter, and

was added as a party to the Shareholders Agreement.

The Shareholders Agreement contains two further provisions necessary to understand the

dispute at issue here.  First, paragraph 2(c), which defines the persons qualified to be

shareholders of Delaware Valley P.C., provides that "no Shares shall be issued by the

Corporation . . . except in accordance with the provisions of this Agreement and to a person

licensed to render the Services in the State [of Pennsylvania]," and "[a]ny attempted issuance . . .

in violation of this provision shall be void and ineffective."  Second, paragraph 4(b), which sets

out procedures for the "involuntary transfer" of a shareholder's shares, identifies a series of

"Involuntary Transfer Event[s]," including, *inter alia*, if a shareholder "permanently lost his or

her License for reasons bearing on such Shareholder's professional competence, professional

performance, or financial integrity."  If an Involuntary Transfer Event occurs, the Shareholders Agreement requires the "Transferring Shareholder" to sell their shares to the other shareholders or Delaware Valley P.C. for the "Purchase Price," an amount calculated via a formula set out in the Shareholders Agreement.

Before the conversion, no-one asked Siegel about the status of his professional license. In January 2019, however, Abdelsamie noticed the Shareholders Agreement's requirement that each shareholder be licensed to render services.  Upon investigation he learned that Siegel's license was inactive.

On or about March 2019, an attorney for Defendant Goldstein informed Siegel's attorney that because of Siegel's inactive license, Siegel was subject to the Shareholders Agreement's Involuntary Transfer provision, and that accordingly Siegel was required to sell his shares to the practice.  Siegel's attorney responded that the Involuntary Transfer provision did not apply to Siegel, but that, nevertheless, Siegel was willing to sell his shares if he received full payment of the purchase price up front, rather than over the 48-month period contemplated in the Shareholders Agreement.  Defendants did not accept Siegel's counter-offer.

Instead, on June 5, 2019, Defendants sent a notice to Siegel that his shares "have been cancelled effective as of the date of their issuance."  The reason provided was that, pursuant to paragraph 2(c) of the Shareholders Agreement, the issuance of shares was limited "to a person licensed to render the oral and maxillofacial surgery services in Pennsylvania," and voids issuance of shares "to a person not Licensed."  The notice explained that Siegel's "voluntarily surrender" of his Pennsylvania dental license in December 2014, prior to the formation of Delaware Valley P.C., meant that he was not qualified to be a shareholder of the corporation at the time of its creation and that, accordingly, Siegel's shares were void at the time of their

4

issuance.  The notice went on to demand that Siegel return all shareholder distributions, health insurance, and pension benefits in the amount of $825,830, required him to accept a buyout for his interest in DVLLC for $502,000, and concluded that he owed $324,000 to Delaware Valley P.C.

## II.   PROCEDURAL HISTORY

The procedural history of this matter must be seen through the lens of paragraph 21(b) of the Shareholders Agreement, an arbitration clause, which provides that "expedited arbitration shall be the exclusive remedy to resolve any dispute or alleged breach relating to this agreement, whether statutory or sounding in contract or in tort, excepting . . . actions in equity."  Although the clause requires arbitration for most disputes, it carves out of its mandate any "actions in equity."

At the outset of the litigation, Defendants filed a motion to stay the case and compel arbitration on the theory that all of the claims set forth by Plaintiff are contractual or statutory non-equity claims and, thus, all of them must be decided by arbitration.  Plaintiff, focusing on the remedies he is seeking rather than the claims he makes, asserted that he was seeking only equitable relief and that his complaint contained no claim for a remedy at law.  The Court stayed the case allowing the parties to proceed to arbitration.

At arbitration, the issues to be decided were framed as: (1) whether Siegel's shares were properly cancelled under the Shareholders Agreement because he was not licensed to perform dental procedures in Pennsylvania; (2) whether a monetary award against Siegel for distributions he received when he was not licensed to receive such distributions should be made; and, (3) whether Siegel's share should be determined by the formula contained in the Shareholders Agreement or by a different determination.  Defendants sought a declaration that Siegel's shares

had been properly cancelled as well as a monetary award in the amount of $323,830.16 – the balance of the shareholder distributions he received while not properly licensed less an amount for his buyout.

On April 27, 2020, the arbitrator issued her award concluding that Delaware Valley P.C. had legal right to cancel Siegel's shares and Siegel was not entitled to reinstatement of his shares, reasoning that Siegel's placement of his license into inactive status precluded him from receiving shares in Delaware Valley P.C. because he was not "a person licensed to render the Service in the State" for purposes of paragraph 2(c) of the Shareholders Agreement.  Thus, the arbitrator explained, "[w]hile no one may have intended the conversion to preclude Siegel from owning shares, it unfortunately did just that."  The arbitrator found that Defendants could only cancel Siegel's shares with proper compensation, however, and therefore concluded that Siegel could keep the shareholder distributions he received while his license was inactive.  The arbitrator reasoned that there was no evidence that Siegel fraudulently concealed his inactive license, and that Siegel was paid the shareholder distributions in reliance on the advice of Burns and Lundy, as well as on the belief that the conversion in corporate form had affected no change to Siegel's partial ownership of the practice.  The Court subsequently confirmed the arbitration award.

Upon motion, the Court granted Siegel leave to amend his complaint, which he did.  His Second Amended Complaint alleged breach of contract (Count I);[1] breach of fiduciary duty

---

[1] Plaintiff pleads two counts – unjust enrichment and tortious interference with business expectancy – in the alternative to his contract claim.  No Pennsylvania court has recognized a cause of action for tortious interference with business expectancy, but the Pennsylvania courts do recognize a cause of action for tortious interference with prospective contractual relations and the Court reads Plaintiff's complaint to be asserting that claim.  *See Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 212 (3d Cir. 2009).  Such claims are distinguished from claims for tortious interference with contractual relations, where a party already has rights under an existing contract.  *Id.* Because the parties did have a valid contract – the Shareholders Agreement – these counts must be dismissed.  *See Halstead v. Motorcycle Safety Found., Inc.*, 71 F.Supp.2d 455, 459 (E.D. Pa. 1999) (existence of valid contract precludes recovery on unjust enrichment theory); *see also UniStrip Techs., LLC v. LifeScan, Inc.*, 153 F.Supp.3d

(Count IV); oppression of a minority shareholder (Count V); conversion (Count VI); civil conspiracy (Count VII); declaratory judgment (Count VIII); reformation of the Shareholders Agreement (Count IX); oppression of a minority shareholder/equitable buyout (Count X); declaratory judgment/equitable estoppel (Count XI); and, rescission (Count XII).  Defendants now move to dismiss the complaint for failure to state a claim upon which relief can be granted. The central question to be decided is whether there are any viable "actions in equity" to be adjudicated following the arbitrator's ruling.[2]

## III.   LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). Although on a motion to dismiss a court must "accept all factual allegations in the complaint as true and give the pleader the benefit of all reasonable inferences that can be fairly drawn therefrom," *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993) (citation omitted), the court need not accept "unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation," *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007)

---

728, 742 (E.D. Pa. 2015) (plaintiff asserting tortious interference with prospective contractual relations claim must show "something less than a contractual right" (internal quotation marks and citation omitted)).

[2] Siegel also argues that because the Court granted him leave to amend the First Amended Complaint on the basis that it could not conclude that further amendment would be futile, the law of the case doctrine bars Defendants' motion to dismiss.  Siegel is incorrect.  "The law of the case doctrine directs courts to refrain from re-deciding issues that were resolved earlier in the litigation." *Pub. Interest Rsch. Grp. of N.J., Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116 (3d Cir. 1997).  In granting Siegel leave to amend to bring claims consistent with the arbitration award, the Court did not decide the question now presented: whether Siegel's complaint, now twice amended, in the context of the provisions of the Shareholders Agreement, states a claim upon which relief can be granted.

(internal quotation marks and citations omitted).

The standard of review is complicated somewhat here because the arbitration award has been confirmed under the Federal Arbitration Act, *see Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 590 (2008), and is thus a final and enforceable judgment, *Teamsters Local 177 v. United Parcel Serv.*, 966 F.3d 245, 248 (3d Cir. 2020) (citing 9 U.S.C. § 13), which is binding as to issues of fact and law in subsequent judicial proceedings including this one. *See Witkowski v. Welch*, 173 F.3d 192, 200 (3d Cir. 1999) (concluding that the arbitration award "confirmed in full" was a final judgment under Pennsylvania law for purposes of collateral estoppel).[3] Thus, the arbitration award has a collateral estoppel effect to the extent that the arbitrator actually and necessarily decided an issue. *Frog, Switch & Mfg. Co. v. Pa. Human Relations Comm'n*, 885 A.2d 655, 661 (Pa. Commw. 2005).[4]

## IV.   DISCUSSION

A determination as to whether the claims of Siegel's complaint fall within the scope of paragraph 21(b) is helped by putting his claims into four conceptual buckets: (1) his breach of

---

[3] Further, because the operative complaint attaches and explicitly relies upon the findings of the arbitration award it may be considered on this motion to dismiss. *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (citations omitted).

[4] Siegel filed two motions in limine to collaterally estop Defendants from contesting specific factual findings of the arbitration, though he withdrew one of these motions following the confirmation of the arbitral award. The remaining motion in limine seeks to collaterally estop Defendants from contesting that none of the parties intended paragraph 2(c) or the conversion of the practice to a professional corporation to allow Defendants to cancel Siegel's shares, and that Siegel relied on the advice of Lundy that the conversion would not affect Siegel's partial ownership of the practice.

"[A] motion *in limine* is designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions," *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1069 (3d Cir. 1990) (citations omitted), and is not a proper vehicle for making arguments that should have been raised in a response to a pending motion to dismiss. To the extent that Siegel's motion in limine seeks to preclude arguments Defendants made in their motion to dismiss, Siegel's motion in limine will be denied as a sur-reply filed without leave of the Court, *see* Judge Wendy Beetlestone's Policies and Procedures IV.A ("Sur-reply briefs are not permitted absent prior permission of the Court upon good cause shown"), and will otherwise be denied as mooted by the dismissal of Siegel's claims. That said, leave to file a sur-reply would not have been granted here, in that the arbitration award has a collateral estoppel effect on both parties to the extent that the arbitrator actually and necessarily decided an issue.

contract claim, which Pennsylvania law categorizes as an action at law; (2) his breach of

fiduciary duty and minority shareholder oppression claims, which can be categorized as tort or

equitable claims depending on the nature of the claim; (3) his claims for declaratory judgment,

which can be either actions at law or equity; and, (4) reformation claims, which are categorized

as actions in equity.[5]

### A.  Legal Claims, Equitable Claims and Equitable Remedies

Now that arbitration is complete, the dispute before the Court in essence involves a

question of line-drawing.  The question presented is whether any of the claims set forth in

Plaintiff's Second Amended Complaint are "actions in equity" which fall outside the mandatory

---

[5] All other counts of the Second Amended Complaint – regardless of the impact of paragraph 21(b) of the Shareholders Agreement – cannot survive a motion to dismiss.  Siegel's claims for conversion and civil conspiracy sound in tort, *see McKeeman v. Corestates Bank, N.A.*, 751 A.2d 655, 659-60 & n.3 (Pa. Super. 2000), and are thus barred by the gist of the action doctrine, which forecloses tort claims: "1) arising solely from the contractual relationship between the parties; 2) when the alleged duties breached were grounded in the contract itself; 3) where any liability stems from the contract; or 4) when the tort claim essentially duplicates the breach of contract claim or where the success of the tort claim is dependent on the success of the breach of contract claim."  *B.G. Balmer & Co. v. Frank Crystal & Co., Inc.*, 148 A.3d 454, 469 (Pa. Super. 2016) (brackets, internal quotation marks, and citation omitted); *see also Bruno v. Erie Ins. Co.*, 106 A.3d 48, 68 (Pa. 2014) (determining factor is "the nature of the duty alleged to have been breached, as established by the underlying averments supporting the claim in a plaintiff's complaint").

Under Pennsylvania law, "to state a civil action for conspiracy, a complaint must allege: 1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; 2) an overt act done in pursuance of the common purpose; and 3) actual legal damage." *Goldstein v. Phillip Morris, Inc.*, 854 A.2d 585, 590 (Pa. Super. 2004) (citation omitted).  Conversion is "the deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, without the owner's consent and without lawful justification," *McKeeman*, 751 A.2d at 659 n.3 (internal quotation marks and citation omitted).  Siegel's conversion claim alleges that Defendants unlawfully deprived Siegel of his "rights in an enjoyment of his shares of stock" in Delaware Valley P.C., and Siegel's civil conspiracy claim similarly alleges that Defendants "through concerted action . . . unlawfully deprived Siegel of shares."  But Siegel's purported right to his shares arises from the Shareholders Agreement, which created the parties' shares in Delaware Valley P.C., and the issue of lawful justification depends on whether specific provisions of the Shareholders Agreement permitted Defendants to void Siegel's shares.  The gist of Siegel's conversion and civil conspiracy claims therefore is contract, not tort.  *See, e.g., Brown & Brown, Inc. v. Cola*, 745 F.Supp.2d 588, 622 (E.D. Pa. 2010) (gist of the action doctrine bars conversion claims "where the alleged entitlement to the chattel arises solely from the contract between the parties" (citation omitted)).  Accordingly, Counts VI and VII will be dismissed.

In Count XII, Siegel seeks equitable rescission of the Shareholders Agreement on the basis of equitable estoppel. Equitable estoppel is not a basis under Pennsylvania law for rescission of a contract.  *See Umbelina v. Adams*, 34 A.3d 151, 158 (Pa. Super. 2011) ("the only grounds upon which equity will permit rescission of an executed contract are fraud, mistake, failure of consideration, and quia timet" (internal quotation marks and citation omitted)). Count XII will, thus, be dismissed.

arbitration provisions of paragraph 21(b) such that they remain to be decided by this Court.

"[W]hether a dispute falls within the scope of an arbitration clause depends upon the relationship between (1) the breadth of the arbitration clause, and (2) the nature of the given claim." *CardioNet, Inc. v. Cigna Health Corp.*, 751 F.3d 165, 172 (3d Cir. 2014). With respect to the evaluation of the nature of a claim, the focus is on the "factual underpinnings of the claim rather than the legal theory alleged in the complaint," in order to "prevent a creative and artful pleader from drafting around an otherwise-applicable arbitration clause." *Id.* at 173 (internal quotation marks, brackets, and citations omitted). Any doubts as to the scope of an arbitration clause should be resolved in favor of arbitration. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983) (citing 9 U.S.C. § 2).

The first order of business is, therefore, to parse the meaning of paragraph 21(b) of the Shareholders Agreement to determine its breadth. In Pennsylvania,[6] an interpretation of an arbitration clause requires the application of "the rules of contractual construction, adopting an interpretation that gives paramount importance to the intent of the parties and ascribes the most reasonable, probable, and natural conduct to the parties. In interpreting a contract, the ultimate goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement." *Fellerman v. PECO Energy Co.*, 159 A.3d 22, 30 (Pa. Super. 2017) (internal quotation marks, brackets, and citation omitted). Here, paragraph 21(b) provides that "expedited arbitration shall be the exclusive remedy to resolve any dispute or alleged breach relating to this agreement, whether statutory or sounding in contract or in tort, excepting . . . actions in equity." This provision unambiguously requires disputes "relating to"

---

[6] The Shareholders Agreement provides that Pennsylvania law shall apply. *See also In re Remicade (Direct Purchaser) Antitrust Litig.*, 938 F.3d 515, 522 (3d Cir. 2019) (explaining that "applicable state law governs the scope of an arbitration clause – as it would any other contractual provision – in the first instance").

the Shareholders Agreement to be decided exclusively in arbitration excepting only "actions in equity." The phrase "relating to this agreement" in an arbitration clause encompasses all claims arising out of a contractual relationship. *See, e.g.*, *Saltzman v. Thomas Jefferson Univ. Hosps., Inc.*, 166 A.3d 465, 478-79 (Pa. Super. 2017); *Pittsburgh Logistics Sys., Inc. v. Prof'l Transp. & Logistics, Inc.*, 803 A.2d 776, 781-82 (Pa. Super. 2002). Accordingly, while the Shareholders Agreement permits actions in equity to be brought to court, it requires that all other claims concerning its violation – including all actions at law, whether sounding in contract or tort – must be arbitrated.

Furthermore, by carving out an exception for all "actions in equity," paragraph 21(b)'s reach is broader than an arbitration provision that excepts demands for "equitable relief." *Cf. Trs. of Univ. of Pa. v. Aetna Inc.*, 2013 WL 11250743, *4 (Pa. Super. Nov. 1, 2013) (arbitration clause "expressly exclude[d] claims for equitable relief" where it provided that disputes "relating to" contract "except for . . . equitable relief" must be settled in arbitration). In other words, although paragraph 21(b) provides that any equitable <u>action</u> need not be arbitrated, it does not exempt from mandatory arbitration legal causes of action which seek as a remedy equitable <u>relief</u>. Accordingly, if a particular claim is a legal cause of action which seeks equitable relief it must, pursuant to the terms of the mandatory arbitration clause, be resolved in arbitration.

Siegel focuses the Court's attention not on the nature of his claims, but rather on the remedies he seeks. Specifically, although the arbitrator already evaluated whether he could retain shareholders distributions pursuant to the Shareholders Agreement, Siegel alleges that monetary damages are inadequate to compensate him for the harm caused by Defendants' actions and seeks equitable relief designed to, *inter alia*, cancel the notice of share cancellation, restore ownership of his stock, and to put him in the position prior to Defendants' actions

11

following the discovery of his inactive dental license.[7]

In determining whether a cause of action is in equity one looks to its categorization in Pennsylvania's case law, while "focus[ing] on the factual underpinnings of the claim rather than the legal theory alleged in the complaint." *CardioNet*, 751 F.3d at 173.  Once that is done and any given claim is determined to be one in equity, it does not necessarily follow that equitable relief is warranted because under Pennsylvania law, "[i]t is well established that a court of equity will not grant relief to one who has a complete and adequate remedy at law." *Sixsmith v. Martsolf*, 196 A.2d 662, 663 (Pa. 1964) (citations omitted); *see, e.g.*, *Twp. of Salem v. Miller Penn Dev., LLC*, 142 A.3d 912, 921 (Pa. Commw. 2016) (plaintiff with adequate remedy at law "had no cause of action in equity").  "An action for damages is an inadequate remedy when there is no method by which the amount of damages can be accurately computed or ascertained." *Clark v. Pa. State Police*, 436 A.2d 1383, 1385 (Pa. 1981) (citations omitted); *see also Kroblin Refrigerated Xpress, Inc. v. Pitterich*, 805 F.2d 96, 103 (3d Cir. 1986) ("When a court cannot arrive at a legal measure of damages with a sufficient degree of certainty, no adequate remedy at law exists" (citation omitted)).

The adequacy of an alternative legal remedy does not depend on the likelihood that a plaintiff will succeed in recovering at law. *Tudor Dev. Grp., Inc. v. U.S. Fid. & Guar. Co.*, 968 F.2d 357, 364 (3d Cir. 1992) (citation omitted); *see also Willing v. Mazzocone*, 393 A.2d 1155, 1158 (Pa. 1978) ("In deciding whether a remedy is adequate, it is the remedy itself, and not its possible lack of success that is the determining factor" (citation omitted)).  In short, "the fact that [available] remedies . . . might not make [a plaintiff] whole does not mandate a finding that such

---

[7] Nevertheless, many of the counts of the complaint seek punitive damages, in addition to equitable relief.  As discussed *supra* notes 1 and 4 and *infra*, however, these claims fail, and "[i]t is settled law that one cannot recover punitive damages independently from an underlying cause of action."  *DiGregorio v. Keystone Health Plan E.*, 840 A.2d 361, 370 (Pa. Super. 2003) (citations omitted).

remedies are inadequate, thereby requiring this court to grant equitable relief." *Tudor*, 968 F.2d at 364.

### B. Breach of Contract Claim

In Pennsylvania a breach of contract action is an action at law, not equity. *See, e.g.*, *W. Coast Servicing, Inc. v. Gore*, 2019 WL 6318528, at *2 (Pa. Super. Nov. 25, 2019) ("A claim for money due and owing under a contract is quintessentially an action at law." (internal quotation marks and citation omitted)); *PNC Bank, Nat. Ass'n v. Bluestream Tech., Inc.*, 14 A.3d 831, 836 (Pa. Super. 2010) (noting "common law distinctions between contract . . . and equity actions" (internal quotation marks and citation omitted)); *McGaffic v. City of New Castle*, 74 A.3d 306, 318 (Pa. Commw. 2013), as modified (Jan. 22, 2015) (explaining that a claim was "for breach of contract, *i.e.*, an action at law").

Siegel concedes as much but argues that because the remedy he seeks for his breach of contract claim – a permanent injunction for specific performance ordering Defendants to retract the notice of share cancellation, restore Siegel's shares, and refrain from interfering in Siegel's rights under the Shareholders Agreement – is an equitable remedy his action for breach of contract does not fall within the scope of the arbitration clause.[8]

Certainly, "[s]pecific performance is an equitable remedy that permits the court to compel performance of a contract when there exists in the contract an agreement between the parties as to the nature of the performance." *Lackner v. Glosser*, 892 A.2d 21, 31 (Pa. Super.

---

[8] At multiple points, in an apparent attempt to circumvent page limits, Siegel seeks to incorporate into his briefing in response to Defendants' Motion to Dismiss arguments that he made in briefs responding to motions made by Defendant in earlier stages of this litigation. Such tactics are frowned upon, *see Miller UK Ltd. v. Caterpillar, Inc.*, 292 F.R.D. 590, 592 (N.D. Ill. 2013) (collecting cases "disapprov[ing] stratagems to avoid page limitations" including "adoption by reference to other filings or documents"), and further do not honor Rule 7.1(c) of the Local Rules of the Eastern District of Pennsylvania which requires that each motion be accompanied by its own brief "containing a concise statement of the legal contentions and authorities relied upon in support of the motion." Plaintiff's invitation to the Court to search through his previous filings – on which this Court has already ruled – for support of the arguments he makes in opposition to the motion now before it is, accordingly, declined.

2006) (emphasis, internal quotation marks, and citation omitted).  It is not, however, an independent cause of action, but instead an equitable remedy for breach of contract.  *See Nationwide Life Ins. Co. v. Franklin Mills Assocs. Ltd. P'ship*, 2014 WL 4722623, at *5 n.1 (E.D. Pa. Sept. 23, 2014) (collecting cases).  Further, it is not a remedy that is available if there is an adequate remedy at law.  *Oliver v. Ball*, 136 A.3d 162, 166 (Pa. Super. 2016) (citation omitted); *see also Trs. of Univ. of Pa.*, 2013 WL 11250743 at *4 (with respect to specific performance, "to determine whether equity jurisdiction is proper in the face of an existing legal or statutory remedy, we must determine if the legal remedy available is adequate and complete" (internal quotation marks and citation omitted)).  Once again, paragraph 21(d) provides that all actions in law must go to arbitration:  It does not carve out an exception for actions in law which seek an equitable remedy.[9]

Even if that were not the case, here Siegel was provided with an adequate remedy for his contract claim by the arbitrator: The arbitration award identified as one of the issues she was to decide "[w]hether Respondent Siegel's shares . . . were properly cancelled under the Shareholders Agreement because [he] was not licensed to perform dental procedures in Pennsylvania."  This is the gravamen of Count I, in which Siegel alleges that the cancellation of his shares breached the Shareholders Agreement.  The arbitrator found that Defendants were entitled to cancel Siegel's shares – that is, that they did not breach the Shareholders Agreement – but found further that they were required to compensate him for his shares in the form of the shareholder distributions he received while his license was inactive.  For purposes of making

---

[9] Siegel relies on *In re Brown Estate*, 289 A.2d 77 (Pa. 1972) for the proposition that under Pennsylvania law, equitable relief is appropriate for breach of contract claims relating to the sale of stock in closely-held corporations.  Regardless, as previously discussed, the arbitration provision of the Shareholder Agreement is quite clear that only equitable claims are exempted from arbitration – and makes no special provision for legal claims seeking equitable relief.

shareholder distributions, the arbitration award explained, "[t]he value of Siegel's shares was properly computed using the formula in both the [Operating Agreement] and the [Shareholders Agreement]."  Accordingly, the arbitrator determined that the value of Siegel's shares was ascertainable (that their value could be evaluated using a contractually-agreed upon formula); *provided* Siegel compensation for his shares by allowing him to retain shareholder distributions.[10]

Simply because he did not get everything he wanted at arbitration does not alter that conclusion.  Siegel sought and received a legal remedy for his claims.  He may not have received exactly what he wanted.  But, you can't always get what you want.  Specifically, one does not have an equitable remedy when an adequate legal remedy is available.  Having received a remedy in law for his contract claim Siegel cannot now circumvent the mandatory arbitration provision of the Shareholders Agreement by asserting that the remedies he is seeking are in equity.  Accordingly, Siegel's breach of contract claim is not an action in equity, and will be dismissed.

### C.  Fiduciary Duty and Minority Shareholder Oppression Claims

In the second category of claims, Siegel asserts claims for breach of fiduciary duty (Count IV), and for oppression of a minority shareholder (Counts V and X), a category of

---

[10] Siegel's briefing repeatedly asserts that though the arbitrator concluded that Siegel was entitled to compensation for his shares, the arbitrator "inexplicably" failed to award any compensation.  The Second Amended Complaint similarly alleges in Count X that the arbitrator found that Defendants "were legally entitled to cancel the shares, however, not without proper compensation," and thus seeks an equitable buyout for Siegel's interest.  Contrary to Siegel's construal of the arbitration award, the arbitrator did not award Siegel any *further* compensation because it concluded that Siegel had *already* been compensated through shareholder distributions and allowed him to keep those distributions.  Though on a motion to dismiss a complaint's allegations must be accepted as true, where a complaint explicitly relies on a prior arbitration decision, a court "examine[s] the decision to see if it contradicts the complaint's legal conclusions or factual claims."  *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 427 (3d Cir. 1999) (citations omitted).  Siegel's assertion that the arbitrator concluded that he is entitled to compensation that he has not yet received is contradicted by the arbitration award itself.

fiduciary duty claims. *See Ford v. Ford*, 878 A.2d 894, 905 (Pa. Super. 2005).

Pennsylvania courts "variously characterize[]" claims for breach fiduciary duty "as sounding in tort and in equity," *Linde v. Linde*, 220 A.3d 1119, 1147 (Pa. Super. 2019) (collecting cases), consistent with Section 874 of the Restatement (Second) of Torts which provides that "[a] fiduciary who commits a breach of his duty as a fiduciary is guilty of tortious conduct," and that "local rules of procedure, the type of relation between the parties and the intricacy of the transaction involved, determine whether the beneficiary is entitled to redress at law or in equity." Restatement (Second) of Torts § 874, cmt. B (1979).[11]

Consistent with Section 874, breach of fiduciary claims brought, as here, by a minority shareholder in a closely-held corporation for the oppressive conduct of majority shareholders are actions in equity. *See Ford*, 878 A.2d at 899 (a "claim of oppressive conduct, like a claim of breach of fiduciary duty, sounds equity" (internal quotation marks and citation omitted)); *Baron v. Pritzker*, 52 Pa. D. & C.4th 14, *3 (Com. Pl. 2001) (minority shareholder oppression claims were "tort claims" brought in an "action in equity"). Thus, Counts IV, V, and X plead tort claims that are treated as actions in equity under Pennsylvania law.

Nevertheless, these claims do not fall within the carve out provision of paragraph 21(b) because "a plaintiff in a shareholder suit, as in any other suit, must lack an adequate legal remedy before bringing his suit in equity." *Id.* at n.7. As to Siegel's injuries, Count IV alleges that he was harmed via "the deprivation of his shares and the rights flowing therefrom." Counts V and X allege that Defendants defeated his reasonable expectations as a minority shareholder, which

---

[11] Though the Pennsylvania Supreme Court has not explicitly adopted Section 874 of the Restatement (Second) of Torts, the lower courts of Pennsylvania have repeatedly relied on this section, as will this Court. *See, e.g.*, *Linde*, 220 A.3d at 1148; *Ario v. Deloitte & Touche LLP*, 2008 WL 6626953, at *8 n.15 (Pa. Commw. June 13, 2008); *Podolinski v. Episcopal Diocese of Pittsburgh*, 23 Pa. D. & C.4th 385, 400 (Com. Pl. 1995).

included "the continual right to receive future distributions."[12]  As has been discussed, however, the value of Siegel's shares can be ascertained, and Siegel had a complete remedy at law for the value of his shares through arbitration.

Accordingly, Siegel cannot proceed in equity on his breach of fiduciary duty and minority shareholder oppression claims, Counts IV, V, and X are not actions in equity for purposes of paragraph 21(b), and will be dismissed.

### D.  Declaratory Judgment Claims

The same goes for Siegel's declaratory judgment claims – but for slightly different reasons.  A declaratory judgment claim may fit into either a legal or an equitable framework, *Owens-Illinois, Inc. v. Lake Shore Land Co.*, 610 F.2d 1185, 1189 (3d Cir. 1979), depending on the nature of the dispute underlying the claim and whether a plaintiff has an adequate remedy at law.  *Simler v. Conner*, 372 U.S. 221, 223 (1963) ("The fact that the action is in form a declaratory judgment case should not obscure the essentially legal nature of the action"); *AstenJohnson, Inc. v. Columbia Cas. Co.*, 562 F.3d 213, 224-25 (3d Cir. 2009) (declaratory judgment action based on contract would not have been brought as a claim for specific performance because action in assumpsit for damages was adequate remedy at law).  To evaluate whether a declaratory judgment claim is legal or equitable, "[a] workable formula that has been developed is to determine in what kind of suit the claim would have come to court if there were no declaratory judgment remedy."  *Owens-Illinois*, 610 F.2d at 1189 (citation omitted); *see also Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 284 (1988).  "If the declaratory judgment action does not fit into one of the existing equitable patterns but is essentially an

---

[12] Siegel also refers to "the right to inspect books and records, receive regular reports on the corporation's activity and financial position, vote his shares at shareholders' meetings, and otherwise participate in or have a say in the management of the corporation's affairs" – but does not press these issues in his briefing.

inverted law suit" – that is, "an action brought by one who would have been a defendant" in an action at law – then the declaratory judgment action is an action at law. *Owens-Illinois*, 610 F.2d at 1189. If the declaratory judgment action "is the counterpart of a suit in equity" – that is, it would be brought as a suit in equity – then the claim is an action in equity. *Id.* (citation omitted). The focus is on the "factual underpinnings of the claim rather than the legal theory alleged in the complaint." *See CardioNet*, 751 F.3d at 173 (internal quotation marks and citation omitted).

Turning first to Count VIII, Siegel seeks declaratory judgment that he is a shareholder in good standing and that the notice of share cancellation was invalid. Here, it is clear that in the absence of the declaratory judgment statute, Siegel's at law would have been a breach of contract action for damages – a quintessential action at law. Whether Siegel is entitled to a judgment declaring the notice of share cancellation invalid and that he is a shareholder of Delaware Valley P.C. boils down to the viability of the same central contentions: that Defendants were not legally entitled to cancel Siegel's shares under the Shareholders Agreement and that Defendants violated the Shareholders Agreement by voiding his shares in Delaware Valley P.C. Accordingly, irrespective of the legal theory alleged in Count VIII – that is, Siegel's styling of his claim as one for declaratory judgment – Siegel's claim in the absence of the declaratory judgment statute would be one for breach of contract, a theory that he did in fact plead in his complaint, and a legal cause of action that was addressed by the arbitrator. *See Trs. of Univ. of Pa. v. St. Jude Children's Rsch. Hosp.*, 982 F.Supp.2d 518, 539 (E.D. Pa. 2013) (concluding declaratory judgment claim based on contract was legal claim where defendant sued for breach of the same contract in consolidated case); *see also, e.g.*, *Nowak v. Pa. Prof'l Soccer, LLC*, 2012 WL 4459775, at *2 (E.D. Pa. Sept. 26, 2012) (declaratory judgment action claim based on breach of contract was legal claim, so did not fall within exception in arbitration clause for claims seeking

18

"equitable relief").

Turning next to Count XI, Siegel seeks a declaratory judgment that Defendants are equitably estopped from canceling Siegel's shares and that Siegel's shares should be reinstated as if the notice of cancellation were never issued.  Plaintiff postulates as the factual basis for this claim the finding of the arbitrator that Siegel "relied on the statements of Burns and Lundy" – DVLLC's accountant and attorney, respectively – that "nothing was going to change" after DVLLC's conversion to Delaware Valley P.C.

"A doctrine sounding in equity, equitable estoppel recognizes that an informal promise implied by one's words, deeds or representations which leads another to rely justifiably thereon to his own injury or detriment, may be enforced in equity."  *Novelty Knitting Mills v. Siskind*, 457 A.2d 502, 503 (Pa. 1983) (citations omitted).  Nevertheless, "[e]quitable estoppel is not a separate cause of action.  It may be raised either as an affirmative defense or as grounds to prevent the defendant from raising a particular defense."  *Carlson v. Arnot-Ogden Mem'l Hosp.*, 918 F.2d 411, 416 (3d Cir. 1990) (citation omitted); *see also Com., Dep't of Pub. Welfare v. Sch. Dist. of Philadelphia*, 410 A.2d 1311, 1314 (Pa. Commw. 1980) ("an estoppel does not create a cause of action at law and, unless a plaintiff can first show a cause of action, estoppel will not supply one for him"); *Zamos v. McNeil-PPC, Inc.*, 2017 WL 68577, at *6 (E.D. Pa. Jan. 5, 2017) (dismissing claim because plaintiff "cannot bring an equitable estoppel claim as an independent cause of action").

Because equitable estoppel is *only* "a defense used to preclude a person from denying or asserting a claim," *MRO Corp. v. Humana Inc.*, 383 F.Supp.3d 417, 424 n.36 (E.D. Pa. 2019) (citation omitted), one looks to the essential nature of the claim Siegel is making – which is, again, breach of contract.  As discussed, whether Defendants could cancel Siegel's shares

depends on the effect of specific contractual provisions in the Shareholders Agreement.  In the absence of the declaratory judgment statute, Siegel would allege that Defendants breached the Shareholders Agreement by cancelling his shareholder interest; which he in fact did in Count I. Defendants would contend – as they argued in arbitration – that paragraph 2(c) of the Shareholders Agreement permitted them to void Siegel's shares.  And, as he has done here, Siegel would assert that Defendants are equitably estopped from defending their purported breach on the basis that the Shareholders Agreement allowed them to void his shares because his dentistry license was inactive.

For the reasons set forth above, Plaintiffs declaratory judgment claims (Counts VIII and XI) are not equitable claims, fall outside of the scope of paragraph 21(b), and will be dismissed.

### E.  Reformation Claim

In the final category of claims, Count IX asserts a claim for reformation of the Shareholders Agreement.  Siegel alleges that the agreement failed to accurately reflect the intention of the parties that the Shareholders Agreement would not result in changes to shareholders' ownership interests in Delaware Valley P.C.  As to relief, Count IX would reform the agreement to state that no shareholder could lose their ownership interest because of a valid but inactive dental license, and order the reinstatement of Siegel's shares.  In essence, Count IX asserts a claim for equitable reformation on the basis of mutual mistake, and would enforce Siegel's rights under the reformed agreement by reinstating his shares.

Under Pennsylvania law, reformation is an "equitable remed[y] that [is] sparingly granted." *Erie Telecomms., Inc. v. City of Erie, Pa.*, 853 F.2d 1084, 1091 (3d Cir. 1988) (internal quotation marks and citation omitted).  "Reformation presupposes that a valid contract between the parties was created but, for some reason, was not properly reflected in the

20

instrument that memorializes the agreement." *Id.* (internal quotation marks and citations omitted). Reformation is not an independent cause of action, but instead a form of equitable relief. *See, e.g.*, *Murray v. Willistown Twp.*, 169 A.3d 84, 90 (Pa. Super. 2017) (distinguishing "reformation remedy" from "legal basis for such relief").

Yet embedded in Siegel's count for reformation is a cause of action in support of a reformation remedy. "[A] showing of fraud, accident or mistake" supplies the cause of action for "courts of equity . . . to reform a written instrument." *Kutsenkow v. Kutsenkow*, 202 A.2d 68, 68-69 (Pa. 1964) (citation omitted). And, actions for reformation of a contract on the basis of mutual mistake are actions in equity. *See, e.g.*, *Bollinger v. Cent. Pa. Quarry Stripping & Const. Co.*, 229 A.2d 741, 742 (Pa. 1967) (action for reformation on basis of mutual mistake an "action in equity"); *In re LaRocca's Tr. Estate*, 192 A.2d 409, 411 (Pa. 1963) ("As a general rule, the jurisdiction of litigation involving the reformation of written instruments is in the court of common pleas sitting in equity").

Returning, however, to the basics, under Pennsylvania law, equitable relief – including reformation – will not be granted where a plaintiff has an adequate and complete remedy at law. *Sixsmith*, 196 A.2d at 663. If Siegel's success at arbitration had been unmitigated he would have recovered what he ultimately seeks here: his shareholder interest in Delaware Valley P.C. He cannot now, having won some and lost some at arbitration now insist upon reformation in this forum.

Even so, although Count IX styles the arbitration award's findings as the basis for mutual mistake, a closer read refutes this contention. A "[m]utual mistake exists . . . only where both parties to a contract are mistaken as to existing facts at the time of execution." *Felix v. Giuseppe Kitchens & Baths, Inc.*, 848 A.2d 943, 948 (Pa. Super. 2004) (internal quotation marks, brackets,

and citation omitted).  By contrast, "a mistake as to the legal consequences of an assumed state

of facts," such a mistaken interpretation of a legal document, is a mistake of law, and does not

provide a cause of action for reformation.  *Benec v. Armstrong Cement & Supply Corp.*, 2016

WL 6876320, at *4 (Pa. Super. Nov. 22, 2016) (internal quotation marks and citation omitted);

*see also Acme Markets, Inc. v. Valley View Shopping Ctr., Inc.*, 493 A.2d 736, 737 (Pa. Super.

1985) ("A mistake of law occurs where a person is truly acquainted with the existence or

nonexistence of facts, but is ignorant of, or comes to an erroneous conclusion as to, their legal

effect." (internal quotation marks and citation omitted)).

Though Defendants were unaware of Siegel's inactive license when the Shareholders

Agreement was executed, as Siegel concedes, he was aware of his license status.  To support its

allegation of *mutual* mistake, Count IX instead relies on the arbitration award's findings that

none of the shareholders "anticipated the change [from DVLLC to Delaware Valley P.C.] would

lead to the cancellation of Siegel [sic] shares," and other similar statements in the award.  But as

Defendants argue, the parties specifically agreed on the language of the Shareholders Agreement,

and the arbitration award conclusively found that the Shareholders Agreement "requires them to

have an active license."  The findings of the arbitrator relied on by Count IX at most establish

that Siegel, with full knowledge of the facts, erroneously concluded that even though the

Shareholders Agreement explicitly provided that the issuance of shares was limited to those

licensed to practice dentistry and even though he had rendered his license inactive before signing

the agreement, there would be no effect on the issuance of his shares.  This is not a mistake of

fact, however, but a mistake of law.  *See Benec*, 2016 WL 6876320, at *5.[13]

---

[13] Siegel nevertheless contends that Pennsylvania courts will reform contracts that accurately record the parties' agreement if the agreement yields unintended legal consequences, relying on *Murray v. Willistown Twp.*, 169 A.3d 84 (Pa. Super. 2017).  This case is inapposite, however.  In *Murray*, it was undisputed that the parties made a mutual

Stripped of the gloss of mutual mistake, the nature of Count IX is merely an attempt to relitigate the effect of paragraph 2(c) by casting it in the light of the arbitration award's findings as to the parties' expectations about the consequences of DVLLC's conversion to Delaware Valley P.C. a reframing which does not change the result here.

## V.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss shall be granted.  An appropriate order follows.


**December 9th, 2020**                                    **BY THE COURT:**

                                                         **/s/Wendy  Beetlestone, J.**

                                                         _____

                                                         **WENDY BEETLESTONE, J.**

---

mistake of fact.  *See id.* at 89.  *Murray* did not hold that mutual mistake meriting reformation of a contract was established in the circumstances presented here – where Defendants made a mistake of fact, and Siegel made a mistake of law.