IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **PHILIP T. SIEGEL, DDS,**<br>**Plaintiff,**<br><br>v.<br><br>**MARK GOLDSTEIN, BRIAN SMITH,**<br>**JOSEPH MULLIGAN, SAMER**<br>**ABDELSAMIE AND DELAWARE**<br>**VALLEY MAXILLOFACIAL AND ORAL**<br>**SURGERY, P.C. ,**<br>**Defendants.** | **CIVIL ACTION**<br><br><br><br>**NO.  19-2890** |

## MEMORANDUM OPINION

Plaintiff Philip Siegel, a retired dentist, has sued his former dental practice and its
shareholders—Mark Goldstein, Brian Smith, Joseph Mulligan, and Samer Abdelsamie—seeking
relief in connection with their cancellation of his shares.

Plaintiff and Defendants have filed cross-motions for summary judgment pursuant to
Federal Rule of Civil Procedure 56.  For the reasons below, Defendants' Motion shall be granted
and Plaintiff's Motion shall be denied.

### I.    FACTUAL BACKGROUND

Plaintiff and Defendant Goldstein co-founded Delaware Valley Maxillofacial and Oral
Surgery ("DVMOS") as a limited liability company (LLC) in 2003.  Others joined DVMOS and
the members executed an "Operating Agreement" in 2005.

In 2014, Plaintiff retired to Florida and put his license in inactive status.  He "never told
anyone" about the change in his license status but also did not "actively conceal[]" the fact.  He
continued to collect distributions from the practice under the terms of the Operating Agreement.

In 2016, William Burns, accountant to DVMOS, suggested that DVMOS for tax purposes should convert from an LLC to a professional corporation (PC).  Stuart Lundy, counsel for DVMOS, prepared documents for the transition, including a "Shareholders' Agreement" which Plaintiff and Defendants Goldstein, Smith, and Mulligan signed.  (Defendant Abdelsamie became a shareholder later on.)  Describing the effect of the transition, Lundy sent an email stating that the "conversion will not affect any Member's continual right to their share . . . of the monies distributed to all members annually except now they will be shareholder distributions." Plaintiff did not notify the other shareholders that his license was inactive at the time the Shareholders' Agreement was executed.

The Shareholders' Agreement contains an arbitration provision which provides, as relevant here, that: "the parties are agreeing that expedited arbitration shall be the exclusive remedy to resolve any dispute or alleged breach relating to this agreement, whether statutory or sounding in contract or in tort, excepting . . . *other actions in equity. . . .*" (emphasis added).  It also includes a provision that: "no Shares shall be issued by the Corporation nor shall any Transfer of Shares be made by any Shareholder except in accordance with the provisions of this Agreement and *to a person licensed to render the Services in the State*" (emphasis added) (the "Qualified Shareholders Provision").  The Agreement provides further that: "Any attempted issuance or Transfer of Shares in violation of this provision shall be *void and ineffective* and shall not operate to Transfer any interest or title in any Shares to the purported Shareholder or transferee" (emphasis added).

In 2019 the other shareholders discovered Plaintiff's dentistry license had been inactive since 2014—*i.e.*, before the partners entered into the Shareholders' Agreement.  The parties explored a potential buyout but could not reach an agreement.  The shareholder Defendants then

cancelled Plaintiff's shares on the grounds that the initial transfer of shares to him was void per the Qualified Shareholders' Provision in that it required shareholders to have an active license— *i.e.*, one enabling them to render services in Pennsylvania.

### A. Complaint

Plaintiff sued.  In light of the arbitration provision in the Shareholders' Agreement, the Court stayed the matter pending arbitration.

### B. Arbitration

At arbitration, DVMOS presented, as relevant here, the following issues to the arbitrator:

(1) Whether Respondent Siegel's shares of Claimant [DVMOS] were properly cancelled under the Shareholders Agreement because Respondent was not licensed to perform dental procedures in Pennsylvania.

(2) Whether a monetary award against Respondent for distributions he did receive when he was not licensed to receive such distributions should be made.

The arbitrator concluded that Defendants were entitled under the Shareholders' Agreement to cancel Plaintiff's shares: "[Siegel's] shares were rightfully cancelled, and [Siegel] is not entitled to have his shares reinstated."  She found that "[a]t the time the [Shareholders' Agreement] was signed Siegel knew he was not able to perform dental services.  While no one may have intended the conversion to preclude Siegel from owning shares, it unfortunately did just that."  She also found that "[n]o one knew he had rendered his license inactive, and neither his counsel (nor Lundy) thought it mattered or thought to check it and/or missed it" in connection with executing the Shareholders' Agreement.

While the arbitrator concluded that Defendants "were legally entitled to cancel the shares," they could not do so "without proper compensation" and that, while Plaintiff was not entitled to a monetary award, he was not required to return any distribution that had been made to him from the time he put his license into inactive status to when his shares were cancelled.

Specifically, the arbitrator stated that while "the shares are void by the terms of the [Shareholders' Agreement]," the "consequence" for Defendants was that "they paid out distributions when they might not have had to had they checked the licensure status in 2016" and Plaintiff "need not return any distribution." She further found that the distributions made were properly calculated under the buyout formula in the parties' agreements.

### C.  Confirmation of Arbitration Award/Second Amended Complaint

Following arbitration, this Court confirmed the arbitration award and, on Defendants' motion, dismissed all of Plaintiff's claims, concluding that the claims either sounded in law (rather than equity) and, as such, were barred by the mandatory arbitration provision, were premised on a legal cause of action, or in that he had an adequate legal remedy equitable relief was not available to him because. *Siegel v. Goldstein*, 2020 WL 7240451, *9 (E.D. Pa. Dec. 9, 2020), *vacated and remanded*, 2022 WL 2234952 (3d Cir. June 22, 2022).

### D.  Appeal to the Third Circuit

On appeal by the Plaintiff, the Third Circuit affirmed the confirmation of the arbitration award but vacated the order dismissing the case, finding that "Siegel's claims for equitable relief are not precluded solely on the basis of the arbitration provision of the Shareholders' Agreement."[1] *Siegel*, 2022 WL 2234952, at *4.

 As to the breach of contract claim, it determined that Plaintiff's request for relief in the form of reissuance of his shares in the dental practice sounds in equity in that his ownership interest "has a peculiar value . . . incapable of being measured in damages in an action at law," *i.e.* the "rights and privileges of ownership in DVMOS." *Id.* at *5 (quoting *Aldrich v. Geahry*, 80 A.2d 59, 61 (Pa. 1951)).  It also concluded that Plaintiff's fiduciary duty and minority

---

[1] The Third Circuit concluded the reformation claim was correctly dismissed on the basis of a lack of mutual mistake, so it is not at issue here.  *Siegel*, 2022 WL 2234952, at *6.

shareholder oppression claims could proceed in equity because the "buyout formula contained in the Shareholders' Agreement . . . does not contemplate damages for improperly depriving a shareholder of his rights in a corporation," including such rights as to inspect corporate books and records, attend shareholder meetings, and vote one's shares.  *Id*.  With respect to Plaintiff's declaratory judgment counts, it concluded that "[t]o the extent that the inverted breach [of contract] actions sound in equity," the requests for declaratory judgment could also proceed.  *See id.* (citing *Owens-Illinois, Inc. v. Lake Shore Land Co.*, 610 F.2d 1185, 1189 (3d Cir. 1979)).

The Third Circuit remanded for further proceedings on Plaintiff's request for equitable relief noting that its determination did not "preclude the application of the doctrine of collateral estoppel."  *Id.* at *4 & n.2.

## II.   LEGAL STANDARDS

A party is entitled to summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). "Inferences to be drawn from the underlying facts contained in the evidential sources must be viewed in the light most favorable to the party opposing the motion."  *Peters Twp. Sch. Dist. v. Hartford Acc. & Indem. Co.*, 833 F.2d 32, 34 (3d Cir. 1987).  "A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986); *Anderson*, 477 U.S. at 248-52).

## III.   DISCUSSION

### A.  Breach of Contract (Count I)

To the extent that Plaintiff's contract claim sounds in equity, the Third Circuit noted that

its object is "not for damages but for the rights and privileges of ownership in DVMOS." *Siegel*, 2022 WL 2234952, at *5.  Plaintiff picks up on the Third Circuit's language arguing that not only did Defendants' breach of the Shareholders' Agreement cause him harm in the form of the "economic value of his shares and the distributions of profit to which he would be entitled as a shareholder" but also that it caused the "deprivation of the unique rights flowing to [him] as a shareholder of a corporation," including the rights to inspect corporate books and records, receive corporate reports, vote at shareholder meetings, and "otherwise participate in . . . the management of the corporation's affairs."  For such injury, he seeks specific performance of the Shareholders' Agreement through a permanent injunction requiring Defendants to: retract the share cancellation; restore his stock ownership along with "all associated rights and entitlements"; and refrain from interfering in his rights as a shareholder in the business.

For the reasons set forth below, the collateral estoppel effect of the arbitration award bars Plaintiff's breach of contract claim to the extent that it sounds in equity.

### i.    *Collateral Estoppel Effect of the Arbitration Award Bars Plaintiff's Breach of Contract Claim*

Defendants argue that collateral estoppel is fatal to Plaintiff's claims because there is no scenario in which the Court could enter judgment in Plaintiff's favor without "hopelessly conflicting with the confirmed Arbitration Award because the very premise of Plaintiff's claims has already been decided in Defendant's favor."

Collateral estoppel, commonly called issue preclusion, "prevents parties from litigating again the same issues when a court of competent jurisdiction has already adjudicated the issue on its merits, and a final judgment has been entered as to those parties and their privies."  *Witkowski*

*v. Welch*, 173 F.3d 192, 198 (3d Cir. 1999).[2]  "Issue preclusion 'forecloses relitigation in a later

action [] of an issue of fact or law which was actually litigated and which was necessary to the

original judgment.'"  *Id.* at 198-99 (citing *Hebden v. Workmen's Compensation App. Bd.*, 632

A.2d 1302, 1304 (Pa. 1993)); *see also* Restatement (Second) of Judgments § 27 cmt.c (1982)

("An issue on which relitigation is foreclosed may be one of evidentiary fact, of 'ultimate fact'

(*i.e.*, the application of law to fact), or of law.").  Collateral estoppel "relieve[s] parties of the

cost and vexation of multiple lawsuits, conserve[s] judicial resources, and, by preventing

inconsistent decisions, encourage[s] reliance on adjudication."  *Allen v. McCurry*, 449 U.S. 90,

94 (1980).

　　"Under Pennsylvania law, arbitration proceedings and their findings are considered final

judgments for the purposes of collateral estoppel."  *Witkowski*, 173 F.3d at 199; *see also Dyer v.

Travelers*, 572 A.2d 762, 764 (Pa. Super. 1990); Restatement (Second) of Judgments § 84 cmt.c

(1982) ("When arbitration affords opportunity for presentation of evidence and argument

substantially similar in form and scope to judicial proceedings, the award should have the same

effect on issues necessarily determined as a judgment has.").

　　In Pennsylvania collateral estoppel applies if: 1) the issue decided in the prior

---

[2] Defendants appear to trip up over the difference between claim preclusion and issue preclusion at points in their summary judgment briefing.  The two doctrines, while related in the sense they each put restrictions on relitigation, are distinct.  *See Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 77 n.1 (1984) ("The preclusive effects of former adjudication are discussed in varying and, at times, seemingly conflicting terminology, attributable to the evolution of preclusion concepts over the years.  These effects are referred to collectively by most commentators as the doctrine of 'res judicata.'  Res judicata is often analyzed further to consist of two preclusion concepts: 'issue preclusion' and 'claim preclusion.'  Issue preclusion refers to the effect of a judgment in foreclosing relitigation of a matter that has been litigated and decided.  This effect also is referred to as direct or collateral estoppel.  Claim preclusion refers to the effect of a judgment in foreclosing litigation of a matter that has never been litigated, because of a determination that it should have been advanced in an earlier suit.  Claim preclusion therefore encompasses the law of merger and bar." (internal citations omitted)).

adjudication is identical to the one presented in the later action; 2) there has been a final

judgment on the merits; 3) the party against whom collateral estoppel is asserted was a party or

in privity with the party to the prior adjudication; and 4) the party against whom collateral

estoppel is asserted has had a full and fair opportunity to litigate the issue in question in the prior

adjudication.  *Witkowski*, 173 F.3d at 199 (citing to multiple Pennsylvania state court cases).

Additionally, "[s]ome Pennsylvania courts state that there are actually five—instead of four—

elements to the issue preclusion doctrine.  The fifth element requires that the determination of an

issue in the prior case must have been 'essential' to the previous judgment."  *Id.* at 203 n.15

(citation omitted).  Nonetheless, "the doctrine is essentially the same under either analysis."  *Id.*[3]

An examination of the collateral estoppel effect of the arbitration award on Plaintiff's

breach of contract claim, now proceeding in equity, begins here with a review of the elements,

under Pennsylvania law, of a breach of contract claim: existence of a contract, breach of the

contract, and resultant damages.  *Doe v. Univ. of Scis.*, 961 F.3d 203, 211 (3d Cir. 2020)

(quotation omitted).  The arbitrator concluded that there was a valid contract (the Shareholders'

Agreement), that Defendants did not breach the contract by cancelling Plaintiff's shares so long

as he was provided with "proper compensation," and that Plaintiff was not due a monetary

award.  She determined that the "plain meaning" of the Shareholders' Agreement required that a

shareholder's license be "active" and, on that basis, "the other shareholders were legally entitled

---

[3] The Pennsylvania Supreme Court has also adopted the definition of issue preclusion set forth in Section 27 of the Restatement (Second) of Judgments, *Pennsylvania State Univ. v. Cnty. of Ctr.*, 615 A.2d 303, 306 (Pa. 1992), which states the requirements in the following, similar, terms:

> When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.

Restatement (Second) of Judgments § 27 (1982).

to cancel the shares" given that Plaintiff's license was inactive.  Moreover, she ruled that, while Plaintiff could keep distributions paid up to the point his shares were cancelled as "proper compensation" for the cancellation, he was not entitled to any monetary award.  In effect, then, the arbitrator decided that there was a valid contract; there was no breach of that contract when Defendants cancelled Plaintiff's shares; and that Plaintiff was not due damages beyond the "proper compensation" already given him through prior distributions.

 Here, Plaintiff argues that, to the extent that his breach of contract claim seeks specific performance through the reissuance of his shares (with their associated rights and privileges), it sounds in equity and was thus not decided by the arbitrator, who was confined to deciding his legal claims.  But this argument is too clever by half.  Equitable relief for breach of contract is still predicated on finding a breach in the first place—*i.e.*, an underlying injury.  *See, e.g.*, *Giordano v. Claudio*, 714 F. Supp.2d 508, 532 (E.D. Pa. 2010) ("[W]e note that specific performance is an equitable remedy *for breach of contract*. . . ." (emphasis added)); *Ecosave Automation, Inc. v. Delaware Valley Automation, LLC*, 540 F. Supp.3d 491, 503 (E.D. Pa. 2021) (denying injunctive relief where there was no breach of contract).

Although the arbitrator was charged only with deciding the breach of contract claim insofar as it sounded in law, she decided that Defendants were entitled to cancel Plaintiff's shares.  There is no play in the joints of the arbitration award: the arbitrator determined the Shareholders' Agreement's plain language entitled Defendants to cancel Plaintiff's shares.  In order to give Plaintiff the specific performance he wants—retraction of the cancellation, restoration of his stock ownership along with "all associated rights and entitlements" thereto, as well as an order that the Defendants refrain from interfering in his rights as a shareholder in the business—this Court would have to countermand the decision of the arbitrator (that the shares

were properly cancelled and that Plaintiff is not entitled to have his shares reinstated) on an issue

that was essential[4] to her final judgment[5] on the merits, in an arbitration where all parties in this

matter were present and represented and in which they had a full and fair opportunity to litigate.[6]

This is exactly the kind of result that the collateral estoppel doctrine was developed to avoid.

      The Plaintiff encourages the Court to reject the arbitrator's decision and undertake its

own interpretation of the parties' agreement because he is now proceeding on his equitable rather

than his legal claims.  However, given that "the issues presented and determined in the two

proceedings are the same, it does not matter whether they arise in the context of 'the same or a

different claim'" and, thus, there is no room to conduct such an analysis.  *Nat'l R.R. Passenger*

---

[4] Whether the issues were "essential," is disputed inasmuch as the parties argue about the identity of the issues.  But the arbitrator's interpretation of the contract such that Defendants could cancel Plaintiff's shares and he was not entitled to reinstatement of those shares was clearly "essential" to the arbitration award, where the primary tasks were to determine if Defendants rightfully cancelled Plaintiff's shares and whether Plaintiff was due any monetary award (the answer to both being "no").  *See Nat'l R.R. Passenger Corp. v. Pennsylvania Pub. Util. Comm'n*, 288 F.3d 519, 527 (3d Cir. 2002) ("[I]n determining whether the issue was essential to the judgment, we must look to whether the issue 'was critical to the judgment or merely dicta.'" (citation omitted)).

[5] For the purpose of issue preclusion, "final judgment" includes "any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded preclusive effect."  *Greenway Ctr., Inc. v. Essex Ins. Co.*, 475 F.3d 139, 147-48 (3d Cir. 2007) (citing *Shaffer v. Smith*, 673 A.2d 872, 875 (Pa. 1996)); *see also* Restatement (Second) of Judgments § 13 (1980).  Generally, "arbitration proceedings and their findings are considered final judgments for the purposes of collateral estoppel."  *Martinez v. Nationwide Ins. Co.*, 2020 WL 791067, at *4 (E.D. Pa. Feb. 18, 2020).

[6] Plaintiff suggests that the arbitration hearing differs in its "quality or extensiveness" and, as such, falls into an equitable exception for collateral estoppel, but he does not argue that the arbitration hearing somehow fell below the minimum requirements of due process such that it would fail to qualify as a "full and fair hearing."  *Witkowski*, 173 F.3d at 205 (a "full and fair hearing" requires only that the procedures meet the "minimum requirements of due process" (citation omitted)); *see also id.* ("That the arguments made during the arbitration hearing were not accepted in full by the arbitrator does not mean that the [plaintiffs] were prevented from fully presenting them.").  There is no indication that the arbitration fell below the minimal requirements of due process such that Plaintiff did not receive a full and fair opportunity to litigate the facts underlying his breach of contract claim.  On the contrary, the arbitrator noted the rigor of the proceedings:

      After careful consideration of the testimony, the exhibits, the submissions of the parties, the
      relevant law and the record as a whole, this Arbitrator concludes that Respondent's shares were
      rightfully cancelled, and Respondent is not entitled to have his shares reinstated.  This Arbitrator
      recognizes and appreciates the high quality of both the oral and written presentations by counsel
      for each of the parties.  The result set forth herein is not a reflection of any difference in the
      quality of the presentations, but of a careful review of the record and the relevant legal parameters.

*Corp. v. Pennsylvania Pub. Util. Comm'n*, 288 F.3d 519, 526 (3d Cir. 2002); *see also Cont'l Holdings, Inc. v. Crown Holdings Inc.*, 672 F.3d 567, 576-80 (8th Cir. 2012) (affirming district court determination that party was precluded from further litigating the meaning of a contract provision determined by an arbitrator).

All the factors for collateral estoppel having been met, the arbitrator's decision collaterally estops his breach of contract claim here to the extent that it sounds in equity.[7]

### ii. *Plaintiff's Counterargument: Equitable Exceptions to Collateral Estoppel*

There are, however, "a number of equitable exceptions designed to assure that the [collateral estoppel] doctrine is applied in a manner that will serve the twin goals of fairness and efficient use of private and public litigation resources." *Nat'l R.R. Passenger Corp.*, 288 F.3d at 525. Here, Plaintiff argues that the following exceptions, found in Section 28 of Restatement (Second) of Judgments § 28 (1982), apply[8]:

(1) The party against whom preclusion is sought could not, as a matter of law, have obtained review of the judgment in the initial action; or
. . .
(3) A new determination of the issue is warranted by differences in the quality or extensiveness of the procedures followed in the two courts or by factors relating to the allocation of jurisdiction between them[.]

---

[7] Plaintiff spends much effort on the argument that because the Third Circuit noted that Plaintiff's stock ownership interest has a "peculiar value to plaintiff incapable of being measured in damages in an action at law," *Siegel*, 2022 WL 2234952, at *5 (quoting *Aldrich*, 80 A.2d at 61), he must be *entitled* to equitable relief to redress the loss of that "peculiar value." But the appellate court did not so find: rather it remanded for consideration of whether there was any improper deprivation of Plaintiff's shareholder rights that would warrant equitable relief.

[8] Although the Pennsylvania Supreme Court has not expressly adopted Section 28, it has cited to it with approval. *See, e.g.*, *Rue v. K-Mart Corp.*, 713 A.2d 82, 86 (Pa. 1998). If Section 28 applies, it does so only in the case of mutual collateral estoppel, *i.e.* cases in which the parties in the subsequent suit were parties to the first. *See Nat'l R.R. Passenger Corp.*, 288 F.3d at 525; *see also Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 575 (5th Cir. 2005) (comparing the exceptions to mutual versus non-mutual collateral estoppel). Here, DVMOS was party to the arbitration and is a party here, and the individual shareholders are in privity with DVMOS. Accordingly, this is a case of mutual collateral estoppel.

Restatement (Second) of Judgments § 28 (1982); *see also Nat'l R.R. Passenger Corp.*, 288 F.3d at 525 (applying Section 28 of the Restatement in a case of mutual collateral estoppel).

Specifically, Plaintiff argues that he was unable to obtain review of the merits of the arbitration award or the arbitrator's finding respecting breach of contract due to the limited situations in which courts can vacate arbitration awards, citing 9 U.S.C. § 10.  But Plaintiff does not offer any further legal argument as to whether or how the provisions allowing courts to vacate arbitration awards in certain circumstances under Section 10 should result in the application of the first exception to collateral estoppel *supra*.  Absent reasoned argument by the Plaintiff, the Court has not been provided with the tools to evaluate this argument—so will not.  In any event, Plaintiff *did* obtain review of the arbitration award—twice, first by this Court's confirmation and then on appeal by affirmation of the Third Circuit.

As to Plaintiff's argument that there should be an exception here to application of collateral estoppel because of differences in the quality or extensiveness of the procedures followed by the arbitrator and by this court or because of factors relating to the allocation of jurisdiction between them, that argument is not viable.  Here the arbitrator decided the legal claims that were brought to her by the parties.  Plaintiff argues that "the Arbitrator was unable to consider equitable factors in her decision, because the Shareholder's Agreement prevented her from exercising equitable jurisdiction.  Phrased more coarsely, the Arbitrator only had power over half the case, so it is only logical that her decision cannot have preclusive effect on the other half."

The overarching obstacle standing in the way of Plaintiff's argument is that if were given credence it would effectively eviscerate the doctrine of collateral estoppel when it comes to arbitrations that underlie later proceedings in federal court.  After all, arbitrations are frequently

12

limited to particular types of claims, and the standard by which federal courts may review

arbitration awards is inherently limited by the Federal Arbitration Act, a limitation that reflects a

broader policy of cabining judicial review of arbitration awards.  *See, e.g.*, *Com. ex rel. Kane v.*

*Philip Morris USA, Inc.*, 114 A.3d 37, 51 (Pa. Commw. 2015) ("[T]he FAA reflects a national

policy favoring limited judicial review of arbitration awards."); *Southco, Inc. v. Reell Precision*

*Mfg. Corp.*, 331 F. App'x 925, 927 (3d Cir. 2009); *Dailey v. Legg Mason Wood Walker, Inc.*,

2009 WL 4782151, at *2 (W.D. Pa. Dec. 8, 2009); *see also* 42 Pa. Cons. Stat. § 7314 (limitations

on vacating an award under the Pennsylvania Uniform Arbitration Act).

Since all of the factors for collateral estoppel are met and no equitable exceptions to

collateral estoppel apply, Defendants' motion for summary judgment will be granted in respect

to Plaintiff's breach of contract claim and Plaintiff's motion will be denied.[9]

### B. Fiduciary Duty and Minority Shareholder Oppression (Counts IV & V)

Plaintiff's *ad damnum* clauses for his fiduciary duty and minority shareholder oppression

claims[10] seek similar relief as for his breach of contract claim: an injunction requiring

Defendants to retract the cancellation of his shares; restore his stock ownership in DVMOS with

its associated rights and entitlements; and refrain from interfering in his rights, privileges, and

entitlements as a shareholder.  Relying again on the language used by the Third Circuit to

describe shareholder rights, Plaintiff specifically seeks enjoyment of the rights to inspect

corporate books and records, receive corporate reports, vote his shares at shareholder meetings,

---

[9] Because the equitable exceptions to collateral estoppel argued by Plaintiff do not apply, the Court will not, as Plaintiff urges, engage in any *de novo* interpretation of the Shareholders' Agreement to reach the opposite conclusion of the arbitrator, namely that Defendants' cancellation of his shares "violated the Shareholders' Agreement."

[10] Plaintiff's fiduciary duty claim rests only on his theory of minority shareholder oppression.  Accordingly, his minority shareholder oppression claim and his breach of fiduciary duty claim will be treated together.

and otherwise participate in corporate affairs.  *See Siegel*, 2022 WL 2234952, at *5 (citing 15 Pa.

Cons. Stat. §§ 1508, 1704, 1758).  In his briefing, he also mentions health insurance as part of his

former entitlements as a shareholder.  In the alternative, Plaintiff seeks an "equitable forced buy-

out" of his shares.

Equitable relief is available to address a breach of a fiduciary duty including oppression

of a minority shareholder.  *Linde v. Linde*, 220 A.3d 1119, 1148 (Pa. Super. 2019) (listing cases).

Oppressive actions undertaken against a minority shareholder include "conduct that substantially

defeats the 'reasonable expectations' held by minority shareholders in committing their capital to

the particular enterprise."  *Ford v. Ford*, 878 A.2d 894, 900 (Pa. Super. 2005) (quoting *Gee v.*

*Blue Stone Heights Hunting Club, Inc.*, 604 A.2d 1141, 1145 (Pa. Commw. 1992)).   Actions

taken by majority shareholders to squeeze out[11] a minority shareholder "constitute[] a breach of

the majority shareholders' fiduciary duty to the minority shareholders."  *Linde*, 220 A.3d at 1142

(citation omitted); *see also Viener v. Jacobs*, 834 A.2d 546, 556 (Pa. Super. 2003) ("It is

axiomatic that majority shareholders have a duty not to use their power in such a way to exclude

minority shareholders from their proper share of benefits accruing from the enterprise."); *Bair v.*

*Purcell*, 500 F. Supp.2d 468, 483-84 (M.D. Pa. 2007) (similar).

### i.    *Collateral Estoppel Does Not Bar Plaintiff's Minority Shareholder Oppression Claims*

Before turning to the merits of Plaintiff's minority shareholder oppression claims, there is

some work to be done in regard to whether the arbitration award has some collateral estoppel

---

[11] "By the term 'squeeze-out' is meant the use by some of the owners or participants in a business enterprise of strategic position, inside information, or powers of control, or the utilization of some legal device or technique, to eliminate from the enterprise one or more of its owners or participants. . . .  [The term 'partial squeeze-out' means an] action which reduces the participation or powers of a group of participants in the enterprise, diminishes their claims on earnings or assets, or otherwise deprives them of business income or advantages to which they are entitled.  A squeeze-out normally does not contemplate fair payment to the squeezees for the interests, rights, or powers which they lose."  *Linde*, 220 A.3d at 1141-42 (citation omitted).

14

effect on those claims.

Plaintiff argues that it does.  He presses that collateral estoppel should apply to the arbitrator's findings as they concern the parties' expectations of the effect of the conversion from an LLC to a PC.  He argues that the arbitrator's findings in this regard compel the conclusion that Defendants engaged in oppression of a minority shareholder and that those findings prevent relitigation of the issue here.  For this position he relies on the arbitrator's finding that Plaintiff and other shareholders did not expect that the conversion from LLC to PC would result in share ownership changes and that "[Plaintiff] relied on the statements of Burns and Lundy, as did everyone, that nothing was going to change."[12]

Plaintiff's argument fails because his fiduciary duty and oppression of a minority shareholder claims present different issues than those determined by the arbitrator.  *See Chemi SpA v. GlaxoSmithKline*, 385 F. Supp.2d 514, 517 (E.D. Pa. 2005) ("Issues are not identical 'if the second action involves application of a different legal standard, even though the factual setting of both suits be the same.'" (citation omitted)); *Consolidation Coal Co. v. W.C.A.B.*, 726 A.2d 435, 439 (Pa. Commw. 1999) ("Pennsylvania courts do not find issues to be identical where the policies and procedures of the two legal schemes are different."); *Suppan v. Dadonna*, 203 F.3d 228, 233 (3d Cir. 2000) (similar).  To guide the determination of whether issues are identical, the Restatement of Judgments sets forth four factors: "(1) substantial overlap between the evidence or argument to be advanced in the two proceedings; (2) application of the same rule of law; (3) overlap in discovery and pretrial preparation; and (4) how closely related the claims

---

[12] Specifically, the arbitrator stated: "[w]hile no one may have intended the conversion to preclude Siegel from owning shares, it unfortunately did just that"; "[Siegel] relied on the statements of Burns and Lundy, as did everyone, that nothing was going to change . . . [and] everyone operated under the belief that nothing was changing"; and "while there [were] consequences to the transition, no one on either side foresaw them."

are." *Segal v. Strausser Enterprises, Inc.*, 2019 WL 2450416, at *6 (E.D. Pa. June 12, 2019) (citation omitted) (summarizing the elements listed under Restatement (Second) of Judgments § 27 cmt.c (1982)).

It fell to the arbitrator to determine the meaning of the Shareholders' Agreement and to decide whether it had been breached.  On the other hand, the elements for oppression of a minority shareholder, as discussed *supra*, require evaluating the "reasonable expectations" of the parties, *see Ford*, 878 A.2d at 900—a different inquiry than interpreting a contract or determining whether a breach occurred.  *See* Restatement (Second) of Judgments § 27 cmt.c (1982).  Moreover, as the Third Circuit determined, claims premised on oppression of a minority shareholder are actions in equity, and the arbitrator did not "squarely address Siegel's equitable claims." *Siegel*, 2022 WL 2234952, at *4-*5.  For these reasons, collateral estoppel does not demand summary judgment in Plaintiff's favor in respect to his claims relating to oppression of a minority shareholder.

Defendants also seek to use collateral estoppel in support of their cause, arguing that the oppression of minority shareholder claims are barred by the doctrine.  They argue that the "singular 'issue' in this case is whether the Defendants could cancel Plaintiff's ownership shares in DVMOS" and, since that issue was resolved by the arbitrator, all of Plaintiff's claims are barred.  But for the same reasons as outlined above, the issues presented by Plaintiff's oppression of a minority shareholder claims are distinct from the issues resolved by the arbitrator.  While the arbitrator determined that, as a contractual matter, Plaintiff's shares could be cancelled, the arbitrator made no conclusions under the standard for minority shareholder oppression.

Accordingly, as distinct from his breach of contract claim, collateral estoppel does not directly bar Plaintiff's minority shareholder oppression claims.

### ii.    Merits of Plaintiff's Minority Shareholder Oppression Claims

Nevertheless, as determined *supra*, the arbitrator's interpretation of the parties' agreement is an issue of "ultimate fact" (the application of law to fact), and relitigation of that issue is precluded.  *See* Restatement (Second) of Judgments § 27 cmt.c (1982); *Nat'l R.R. Passenger Corp.*, 288 F.3d at 526 ("As noted in the Restatement, if the issues presented and determined in the two proceedings are the same, it does not matter whether they arise in the context of 'the same or a different claim.'"); *see also Cont'l Holdings*, 672 F.3d at 576-80 (affirming district court determination that party was precluded from further litigating the meaning of a contract provision determined by an arbitrator).

Given the arbitrator's finding that the plain meaning of the parties' agreement required shareholders to have an active license, Plaintiff could not have had reasonable expectations that he could continue to be a shareholder if he did not possess an active license—regardless of whatever comments were made by Burns or Lundy (DVMOS's accountant and counsel, respectively)—or anyone else—on the anticipated effect of the conversion from LLC to PC. Moreover, Plaintiff was the *only one* aware of his inactive license status at the time the Shareholders' Agreement was executed, meaning only he (or perhaps his counsel) could have determined the potential effect of the language requiring an active license, which again renders any reliance on Burns or Lundy's statements unreasonable.  In the end, Plaintiff, represented by counsel, signed an agreement that, as the arbitrator determined, allowed Defendants to cancel his shares.

Plaintiff states generally—without reference to how this proposition applies to his case— that "the majority [*i.e.*, the Defendants] can engage in conduct that is contractually permissible but nonetheless oppressive."  Putting Plaintiff's paucity of argument aside, each of the cases he

cites is non-precedential and are distinguishable in that they do not involve binding contracts.[13] In short, none address the question here: how an express determination by an arbitrator that majority shareholders' conduct *did not* breach the plain meaning of a valid contract affects a determination as to whether that same conduct could constitute oppression of a minority shareholder.

The logic of *Gunderson v. All. of Computer Pros., Inc.*, also cited by Plaintiff, also non-precedential, and also distinguishable (in that it examined the issue of how a written agreement impacts a minority shareholder's reasonable expectations in the context of a specific Minnesota state statute), 628 N.W.2d 173, 186 (Minn. Ct. App. 2001) (citing Minn. Stat. § 302A.751, subd. 3a), is, nevertheless, informative.

In *Gunderson*, the plaintiff, a former shareholder of the defendant, brought suit against defendant after defendant's board of directors voted to terminate him and remove him as a shareholder pursuant to an involuntary withdrawal provision in a buy-sell agreement. *Id.* at 179-80. Plaintiff argued that "the controlling shareholders frustrated his reasonable expectations as a shareholder by enforcing the buy-sell agreement's involuntary-dismissal clause to remove him. . . ." *Id.* at 184 (citing Minn. Stat. § 302A.751, subd. 1(b)(3) (1998)). The lower state court granted summary judgment in the defendant's favor, concluding that the buy-sell agreement was reasonable.

---

[13] Plaintiff relies primarily on *Orchard v. Covelli*, 590 F. Supp. 1548 (W.D. Pa. 1984), *aff'd*, 802 F.2d 448 (3d Cir. 1986). In *Orchard*, the district court concluded that there was oppression of a minority shareholder constituting a breach of fiduciary duty. *Id.* at 1558. But *Orchard* is inapposite because the district court found there was *no* binding contract in that case (finding "no evidence of the existence of a contract for employment, oral or written"). *Id.* at 1556. *Orchard* thus does not bear on the circumstances of this case, where there is a valid contract that has been interpreted to allow, by its plain meaning, Defendants' conduct in cancelling Plaintiff's shares.

Similarly misplaced is Plaintiff's reliance on other cases that did not involve a breach of contract claim. *See Linde*, 220 A.3d 1119; *Viener*, 834 A.2d 546; *Ford*, 878 A.2d 894.

On appeal, the Minnesota Court of Appeals recognized that while "written agreements are not dispositive of shareholder expectations in all circumstances. . . [they] should, nonetheless, be honored to the extent they specifically state the terms of the parties' bargain." *Id.*  It went on to find that the plaintiff's "expectations as a shareholder" were "presumptively reflected" in the agreement at issue (the buy-sell agreement).  *Id.*  And from that, as illuminating here, the court concluded that "no rational factfinder could conclude that the agreement did not reflect his reasonable expectations as a shareholder" given that the written agreement at issue specifically addressed the issue at hand, was executed as the result of an arm's-length transaction, and was drafted in part by the plaintiff-shareholder.  *Id.*

Similarly here, the Shareholders' Agreement, as interpreted by the arbitrator, addresses the issue at hand (whether Defendants could cancel Plaintiff's shares if he had an inactive license); was executed in an arm's-length transaction where Plaintiff was represented by his own counsel; and was executed in a process in which Plaintiff's own counsel negotiated certain terms to be included (as the arbitrator found, Plaintiff's attorney "ultimately negotiated" language concerning modification or amendment to the agreement and its effect on each shareholder's proportionate share).  Moreover, the arbitrator found that "[a]ll parties had the opportunity to be represented by independent counsel" and "[a]ll parties had the opportunity to propose amendments and amendments were made."

Based on these facts, under the reasoning of *Gunderson*—to the extent its logic is applicable outside the context of the specific Minnesota statutory scheme pursuant to which it was decided—no reasonable factfinder could conclude that the agreement did not reflect Plaintiff's reasonable expectations as a shareholder: he was represented by counsel, his counsel was able to propose changes to the agreement, and he and his counsel were responsible for

executing the terms of their bargain.  That Plaintiff and his counsel did not foresee the implication to Plaintiff of the active license requirement in the Shareholder's Agreement is of no moment here.[14]  The Agreement captures Plaintiff's reasonable expectations.

### C.  Declaratory Judgment

The Third Circuit revived Plaintiff's requests for declaratory judgment "[t]o the extent that the inverted breach [of contract] actions sound in equity," referring to the rule that whether declaratory judgment claims sound in law or equity depends on "what kind of suit the claim would have come to court if there were no declaratory judgment remedy."  *Owens-Illinois*, 610 F.2d at 1189.  Yet, for the reasons below, the relief sought in each declaratory judgment count is not available to the Plaintiff.

#### i.    *Count VIII*

Count VIII seeks a declaratory judgment to the effect that Plaintiff is a 20% shareholder in good standing of DVMOS and is "entitled to all the rights, privileges and entitlements afforded to all other shareholders"; and that Defendants' cancellation of his shares was legally invalid.  In this respect, Count VIII essentially seeks the same relief as Plaintiff's breach of contract claim but merely phrases it in terms of a declaratory judgment.[15]  Declaratory judgments

---

[14] Plaintiff advances a separate claim requesting an equitable buyout as an alternative to reinstatement of his stock "as a remedy for his oppression as a minority shareholder."  But because there has been no oppression of him as a minority shareholder, Plaintiff is not entitled to any form of equitable relief in relation to his fiduciary duty claims premised on oppression of a minority shareholder.  *See, e.g.*, *Linde*, 220 A.3d at 1148 ("equitable relief is available to redress the *breach* of a fiduciary duty" (emphasis added)).

Plaintiff also, "[i]n the further alternative," seeks an equitable buyout "either as its own cause of action or under such other pled causes of action."  As a preliminary matter, an equitable buyout is not a cause of action: it is a remedy available to a court to force majority shareholders to buy out a minority shareholder's shares at fair value. *Linde*, 220 A.3d at 1148.  Further, Plaintiff has failed to show that he is entitled to equitable relief under any of his pled causes of action.

[15] As Siegel's own briefing admits, "Count VIII does little more than seek a declaratory judgment that Defendants lacked the power to do what they did. . . ."

are generally inappropriate when they duplicate other claims.  *See Butta v. GEICO Casualty Co. (Butta II)*, 400 F. Supp.3d 225, 231 (E.D. Pa. 2019).  This request seeks little more than to upset the arbitrator's conclusion that Defendants were contractually entitled to cancel Plaintiff's shares, an issue addressed *supra* in respect to Plaintiff's breach of contract claim.  Because the Court has determined that Plaintiff is not entitled to the relief he seeks—reinstatement of his shares or their associated rights, privileges, or entitlements—his request shall be denied.

### ii.      Count XI

Count XI requests the Court to declare that Defendants are equitably estopped from cancelling Plaintiff's stock and that Plaintiff's stock is reinstated ("as though the Notice of Cancellation had never been issued") on the basis that Plaintiff relied on statements by Burns and Lundy that nothing would change as a result of the conversion from LLC to PC.

"Equitable estoppel is a doctrine that prevents one from doing an act differently than the manner in which another was induced by word or deed to expect." *Novelty Knitting Mills, Inc. v. Siskind*, 457 A.2d 502, 503 (Pa. 1983).  Equitable estoppel is not a separate cause of action and can only be raised as an affirmative defense or "as grounds to prevent the defendant from raising a particular defense." *Carlson v. Arnot-Ogden Mem'l Hosp.*, 918 F.2d 411, 416 (3d Cir. 1990). Plaintiff raises equitable estoppel here to defend against Defendants "asserting . . . a contractual right to cancel Siegel's shares." *See Siegel*, 2020 WL 7240451, at *10.

 "[A]n essential predicate of an equitable estoppel claim is that plaintiff's reliance must have been objectively reasonable." *W.A. Butler Co. v. Colgate-Palmolive Co.*, 1992 WL 278008, at *4 (E.D. Pa. Sept. 30, 1992); *see also Wayne Moving & Storage of New Jersey, Inc. v. Sch. Dist. of Philadelphia*, 625 F.3d 148, 155 (3d Cir. 2010) (equitable estoppel requires "unambiguous proof of reasonable reliance upon the misrepresentation by the party asserting

estoppel").  For similar reasons as discussed in respect to Plaintiff's minority shareholder oppression claim, *supra*, the record does not demonstrate objectively reasonable reliance by Plaintiff on the statements made  by Burns and Lundy.

An appropriate order follows.

**BY THE COURT:**


*/s/ Wendy Beetlestone*
_____
**WENDY BEETLESTONE, J.**